UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------X
TRENT BERGER,

                    Plaintiff,                        **1:22-cv-10257(GHW) (SDA)**

   -against-                              **AMENDED COMPLAINT AND**
                                                **JURY DEMAND**

U.S. DEPARTMENT OF COMMERCE and
GINA M. RAIMONDO, SECRETARY OF
U.S. DEPARTMENT OF COMMERCE

                    Defendant.
---------------------------------------------------------X

## PRELIMINARY STATEMENT

1.      This action seeks damages, injunctive relief, attorneys' fees, and other appropriate equitable and legal relief on behalf of Plaintiff as a result of Defendants' violation of his civil rights.

2.      This action is brought to remedy discrimination and retaliation on the basis of Disability (Asperger's Syndrome) pursuant to the ADA (42 U.S.C. § 12111(8)) and Section 504 of the Rehabilitation Act of 1973.

3.      Plaintiff TRENT BERGER (hereinafter "Plaintiff") seeks compensatory and punitive damages and other appropriate relief pursuant to the ADA (42 U.S.C. § 12111(8)) and Section 504 of the Rehabilitation Act of 1973.

4.      Defendant U.S. DEPARTMENT OF COMMERCE is under a duty not to engage in disability discrimination, nor retaliate for complaining about discrimination.

5.      Defendant GINA M. RAIMONDO, SECRETARY OF U.S. DEPARTMENT OF COMMERCE is under a duty not to engage in disability discrimination, nor retaliate for complaining about discrimination.

6.     As hereinafter shown, Plaintiff, who suffers from Asperger's Syndrome, is a member of a protected class and beneficiary of this non-discrimination mandate. As further shown herein, Defendants have breached their duty of non-discrimination.

**JURISDICTION, VENUE, AND CONDITIONS PRECEDENT TO THIS SUIT**

7.     The Court has subject-matter jurisdiction over Plaintiff's federal claims under 28 U.S.C. § 1343(a)(4), 28 U.S.C. § 1331, Section 504 of the Rehabilitation Act of 1973, and the Americans with Disabilities Act, as amended. Plaintiff duly filed charges with the EEOC, and this action was commenced within ninety days of receipt of the notice of right to sue letter.

8.     Venue lies in the Southern District of New York under 28 U.S.C.§ 1391(b)(1) because this is where in which all or part of the cause of action accrued and the District where Defendants maintain a residence, an agency or representative and where Defendant U.S. Department of Commerce is physically present.

**THE PARTIES**

9.     Plaintiff, Trent Berger, is a citizen of the United States and the Commonwealth of Virginia and resides in Clifton, Virginia. Plaintiff has a disability and a perceived disability that impacts major life activities as set forth below. More specifically, Plaintiff suffers from Asperger's Syndrome. Plaintiff had a record of such impairments and was regarded as having such impairments. Plaintiff was an employee as defined by the ADA and Section 504 of the Rehabilitation Act.

10.     Defendant, U.S. Department of Commerce ("Agency" or "Defendant"), is a Federal agency, and Gina M. Raimondo, the U.S. Secretary of Commerce, is the designated statutory defendant under the ADA and Section 504 of the Rehabilitation Act.

## FACTUAL STATEMENT

### A.     Introduction and Plaintiff's Disability

11.     On or about January 25, 2018, Plaintiff was appointed to a GS-11 Geographic Specialist position at the Census Bureau headquarters in the New York Regional Census Center.

12.     Plaintiff suffers from Asperger's Syndrome.

13.     Defendant was aware of Plaintiff's disability.

14.     On or about July 16, 2018, Plaintiff applied for the position of Visual Information Specialist, Vacancy Number: RCC2020NY-2018-01-3, with the Agency.

15.     Plaintiff was diagnosed with Asperger's Syndrome in 2006. Asperger's Syndrome is a part of the autism spectrum. Asperger's is a neurological impairment that can manifest in various ways, including the need for "very clear, explicit instructions; difficulties in "receiving" social cues; intense interests; and repetitive behaviors."

16.     Plaintiff's disability causes him to have below-average coordination, difficulty with small motor skills, and poor penmanship. He also has sensitivity to certain noisy environments and fluorescent lighting, which can cause migraine-type headaches.  Plaintiff also has difficulty making eye contact.

17.     When large amounts of information are disseminated quickly, Plaintiff "may have difficulties immediately processing, retaining and absorbing" such information. As a result of his Asperger's Syndrome, Plaintiff requires a methodical explanation of tasks. Plaintiff must take additional steps to retain information and must "write down a manual of information" to absorb large amounts of material effectively.

18.     Plaintiff writes things down to maintain organization when facing a situation with many moving parts. This process requires comprehensive and time-consuming organization.

19.     Because of his Asperger's Syndrome, Plaintiff often does not pick up on social cues, such as "office politics" or subtle emphasis based on tone and inflection in conversations.

20.     All of the symptoms described are common for an individual with Asperger's Syndrome.

21.     According to U.S. Census Bureau Medical Records, Asperger's Syndrome affects an individual's ability to interact with others, think, learn, and work.

22.     Medical Records indicate that Plaintiff's symptoms worsen during times of stress.

23.     Plaintiff's Asperger's Syndrome condition can make it difficult to adhere to a rigid work schedule due to medical and psychotherapy appointments.

**B.      Plaintiff's Employment with the Agency**

24.     Plaintiff began employment at the Department of Commerce, New York Regional Census Center ("RCC"), U.S. Census Bureau, on January 26, 2018. Plaintiff was subject to a two (2) year probationary period.

25.     Plaintiff received a Master's degree in Geography and maintained relevant previous employment, which qualified him for the Geographic Specialist position.[1]

26.     Plaintiff applied and was hired as a Schedule A appointee. Schedule A is a federal hiring program for people with disabilities. In his application, the Plaintiff disclosed his Asperger's Syndrome diagnosis.

27.     In February 2018, Ms. Zoe Ritter became the interim Acting Geographic Coordinator, which is the direct supervisor of Plaintiff.

---

[1] The position title was reclassified around July 2018 to a Geographer.  Nothing about the duties or qualifications changed.  This was done at the direction on Ms. Ritter who said having this title would position employees better for permanent jobs at headquarters once the decennial Census was completed.  Plaintiff was advised and encouraged to request this reclassification just like the other employees by Ms. Ritter to help his career advancement, which contradicts the notion he was a problem employee.

28.     Prior to this position, Ms. Ritter did not have any supervisory experience and was Plaintiff's co-worker.

29.     The relationship between Plaintiff and Ms. Ritter is described as "cordial," but fellow employee Ms. Yarice Rodriguez states that she "observed behavior in Ms. Ritter that showed impatience on her part when speaking to Plaintiff]"

30.     This behavior included abruptly marching back to her desk after a brief conversation with Plaintiff, which indicated that Ms. Ritter was upset or lacked patience.

31.     In July 2018, Ms. Cynthia Gillham replaced Ms. Ritter as interim Acting Geographic Coordinator, which is the direct supervisor of Plaintiff.

32.     Ms. Gillham did not have prior supervisory experience. Ms. Gillham was made aware of Plaintiff's disability by her former supervisor, Zoe Ritter.

33.     Ms. Gillham was very particular, nit-picking, and critical, telling Plaintiff this was explained clearly when in fact, her suggestions contradicted previous instruction.

34.     Fellow employee Mr. Webb Adams stated that he observed Ms. Ritter and Ms. Gillham provide only minimal guidance, even though Plaintiff consistently requested further instruction.

**C.     Plaintiff's Duties and Work Environment**

35.     In general, Plaintiff's primary duties included conducting research, analyzing census data, updating maps, creating tracking spreadsheets, outreach to potential Participant Statistical Areas Program ("PSAP") program participants and conducting phone interviews for Local Updated Census Addresses (LUCA).

36.     Most of Plaintiff's duties involved the PSAP In March/ April of 2018. This duty involved the review of Census Designated Places ("CDP") by looking at territories and making

adjustments based on population and development over the last decade. Plaintiff volunteered to contact municipal offices to determine if they would participate in the census again. Plaintiff also volunteered to create a tracking spreadsheet.

37.     At the end of April 2018, Plaintiff had a meeting with Lyndy Worscham, a Geographer from headquarters, who worked in the office for most of April. During this meeting, Plaintiff stated that he enjoyed the CDP project, but prior to the project, he did not receive any clear direction in the office on what to do. Ms. Worscham stated that clear instruction was lacking due to the influx of new people in the program.

38.     In May-August 2018, Plaintiff conducted phone interviews and answered phone calls for Local Updated Census Addresses (LUCA). Because he was new to the Census, the Agency had not provided extensive training on LUCA and specifically did not provide clear training on phone interviews.

39.     Due to the limitations caused by his disability, Plaintiff struggled with answering phone calls without a clear understanding of instructions and is uncomfortable discussing a topic outside of his expertise. Plaintiff is more comfortable with research or conducting phone calls that are scripted in nature, such as outreach calls for PSAP.

40.     Plaintiff preferred PSAP calls because he could prepare for the PSAP calls and knew what would likely transpire during the call.

41.     The LUCA calls differ from the PSAP calls because Plaintiff was not trained on the various scenarios that could arise during a LUCA call. Because of his disability, Plaintiff organizes information by writing manuals that prepare him for unexpected scenarios in which he is unable to pick up on social cues. Plaintiff asserts that to successfully make and receive LUCA calls, he needed additional training and the opportunity to take notes about the types of scenarios he may

6

face.

42.     There was a high volume of LUCA calls, and Plaintiff desired some predictability to prepare for the calls. As explained below, even though Plaintiff expressed concerns to his supervisor, Ms. Gillham, the Agency failed to provide him with additional training.

43.     A co-worker, Ms. Yarice Rodriguez, stated that Plaintiff's supervisors wanted him to answer phones and be well informed of census programs, and in response, Plaintiff spent hours reading about census programs and preparing to answer calls. Ms. Rodriguez stated that Plaintiff performed his work as well as everyone else, although he did ask many questions. Plaintiff took copious notes and did everything he was told to do. Ms. Rodriguez observed that Plaintiff's questions made his supervisors, Ms. Ritter and Ms. Gillham, impatient.

44.     In late May 2018, the Agency moved to the 6th Floor of the building. Plaintiff's desk was located in an open noisy office. As previously stated, noise can cause sensory problems for individuals with Asperger's Syndrome, and the new work environment caused such a problem for the Plaintiff.

45.     To address the noise, Plaintiff used noise-canceling headphones to help with concentration. Ms. Gillham told Plaintiff that she had a problem with his use of noise-canceling headphones, even though she was aware that Plaintiff had a disability that could cause noise sensitivity.

46.     Ms. Gillham's behavior indicated an unwillingness to deal with an employee with disabilities.

**D.     Agency Reasonable Accommodation Policy**

47.     The Agency's administrative order "Reasonable Accommodation for Employees or Applicants with Disabilities," Departmental Administrative Order ("DAO") 215-10, outlines the

Agency's reasonable accommodation policy. The reasonable accommodation process begins when an employee makes a request for a change or identifies a barrier.

48.     This request may be made orally or in writing.

49.     Typically, a reasonable accommodation request should be approved or denied within twenty (20) business days from the date that the employee makes the request, and the accommodation should be provided within ten (10) business days of the date the request is approved.

50.     Reasonable accommodation requests with medical documentation requirements may require the time period for the decision process to be tolled temporarily until appropriate medical documentation is provided. Certain extenuating circumstances beyond the need for medical documents may also require tolling the time frame.

51.     An employee at the U.S. Census Bureau may make a reasonable accommodation request to his or her supervisor or manager in his/her immediate chain of command, his/ her Office or Division Director, or the Reasonable Accommodations Coordinator ("RAC").

52.     After a written or oral request is filed, the employee's request will be decided by the immediate supervisor whenever possible.

The Agency's DAO states:

"To determine the appropriate reasonable accommodation, it may be necessary for the agency to initiate an informal, interactive process with the individual with a disability in need of the accommodation. This process should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations. The deciding official and the RAC shall meet with the requestor promptly after receipt of the request to explain the process and, if necessary, obtain additional information."

53.     If the need for accommodation is obvious, and the provision of the request is straightforward, the interactive process may be unnecessary.

54.     The Agency's DAO provides that the deciding official may grant the request or offer alternative means of providing reasonable accommodation. If the deciding official decides the accommodation would pose an undue hardship or is not legally required, the deciding official should continue the interactive process until either a reasonable accommodation is found, or the deciding official determines that the accommodation is not possible.

55.     The RAC will determine if medical documentation is necessary to process the accommodation and will use information gathered to determine if the employee has a covered disability, whether the employee needs an accommodation because of that disability, and what accommodations would be effective.

**E.     May 15, 2018, Progress Review and Request for Reasonable Accommodation**

56.     On May 15, 2018, Plaintiff met with Ms. Ritter to review his mid-year progress. At this point, Plaintiff had worked at the Census for only four months.

57.     Prior to the progress review, Plaintiff was not advised that his performance was lacking. In fact, Plaintiff was assigned to travel, present, and represent the Agency earlier that month at a professional conference.  No mention of this is made by the Agency, which implies that Plaintiff was performing satisfactorily.

58.     Progress reviews are standard procedure, and all employees on the team have such meetings. The Census requires employees to perform at Level 3 or above.

59.     Plaintiff states that during the May 15, 2018, meeting, Ms. Ritter did not inform Plaintiff of the import of a Level 3 rating or even that he was not performing acceptably.

60.     Ms. Ritter admitted during the EEOC investigation, "I never told him that he was in danger of being terminated due to his performance." Ms. Ritter claimed, however, that she informed Plaintiff that he was not meeting the "Level 3" standard.

61.     At the time, Plaintiff had not been told that he was expected to perform at Level 3 or better.

62.     During the May 15 meeting, Plaintiff asked Ms. Ritter whether she knew he was a Schedule A employee.

63.     Ms. Ritter said she did not know and had never heard of the Schedule A hiring program. Plaintiff then disclosed to Ms. Ritter that he has Asperger's Syndrome. Later that day, Plaintiff sent Ms. Ritter an Appendix containing information about Asperger's Syndrome and the workplace.

64.     During the May 15, 2018, meeting, Plaintiff advised Ms. Ritter of his need for accommodations in the form of detailed instructions.

65.     Mr. Berger made Ms. Ritter aware during his progress review that he had been hired under Schedule A hiring authority. During the same progress review, he described how Asperger's Syndrome might affect him on the job. After the meeting, he also sent her a chapter from a textbook about the Asperger's. He also told her at that time that he required more detailed instruction.

66.     At the May 15, 2018, progress review, Ms. Ritter was supposed to give Plaintiff a written copy of his review. However, the Agency failed to provide the May 2018 progress review until two (2) months later and only after Plaintiff repeatedly requested it.

67.     Later in May 2018, Plaintiff emailed Ms. Ritter to confirm her receipt of the Asperger's information. In response, Ms. Ritter told Plaintiff that he did not need to regularly answer LUCA calls, stating that she understands why "answering 'cold' phone calls from partners without more extensive training" would be difficult for Plaintiff. ROI 90. Ms. Ritter instructed Plaintiff to work on PSAP CDP review and answer LUCA calls and take a message only when the rest of the team is busy.

10

68.     As a new Census employee, it was unreasonable to expect that Plaintiff would be informed on all Census operations; even supervisors were not informed on all operations.

69.     Additionally, prior to the May 2018 progress review, Plaintiff was permitted to present on behalf of the Census Bureau about PSAP at a conference, which showed his capability to perform well.

**F.     The May 2018 Request for Reasonable Accommodations**

70.     At the end of May 2018, the Agency's offices were relocated to the New York Regional Census Center (RCC), where the work environment became noisier.  The Agency placed Plaintiff directly under a fluorescent light.

71.     Plaintiff experienced sensitivity to light and noise caused by his Asperger's Syndrome, to the extent that he receives regular Botox injections every 12 weeks to help prevent migraines.  During this time, Plaintiff had gone more than six months or over 26 weeks since his last treatment because his new health insurance plan he enrolled in when he started at the Census in late January was still processing the approval.  Thus, his vulnerability under the fluorescent lights during this time was even more significant.

72.     On May 25, 2018, and May 29, 2018, Plaintiff asked Ms. Ritter to move his workspace to an alternate location.  During the investigation, Ms. Ritter explained that Plaintiff "did tell me that his new location was a little noisier and that the fluorescent light he was directly under affected him because of sensitivity caused by his disability. He did ask me, either the day before we moved or the day of the move if he could move to a better location, and I did ask him to wait a week or so to see how it went."

73.     However, Plaintiff recalls that she asked him to "wait of a couple of weeks."

74.     A co-worker, Ms. Yarice Rodriguez, informed Plaintiff that he did not have to wait

11

a few weeks but instead could make a reasonable accommodation ("RA") request to the Reasonable Accommodations Branch. Ms. Rodriguez has prior experience as a supervisor, in which she managed individuals with disabilities.

75.     On May 30, 2018, Plaintiff filed his first written RA requests with the Reasonable Accommodations Branch, asking for: (1) workspace moved to help with light sensitivity, (2) the ability to leave work at 4:30 on Tuesdays to attend a 5:00 pm doctor's appointment that is a part of regular treatment, and (3) more clarity and training "so I can know better as to where I stand." Notably, the ROI did not contain Plaintiff's written request for reasonable accommodations.

76.     Throughout the record, both Ms. Ritter and Ms. Gillham conveniently chose to omit Plaintiff's request for clarity and training when discussing Plaintiff's requested accommodations.

77.     Within 10 minutes of filing his first formal RA request, Ms. Ritter called Plaintiff into her office and asked him why he submitted a formal request with the Office of Accommodations. Plaintiff explained he was following the advice of his colleague, Ms. Rodriguez, and meant no disrespect to Ms. Ritter's authority. Ms. Ritter expressed concern that Plaintiff initiated a formal request.

78.     On June 27, 2018, the Reasonable Accommodations Branch, Mike Horgan (Assistant Regional Census Manager), and Ms. Gillham (acting supervisor) approved the following accommodations: (1) allow Plaintiff to sit/ work in a corner spot by a window with natural lighting, (2) allow Plaintiff to have a less distracted work area, (3) allow Plaintiff to make up one (1) hour per week due to an early departure for a medical appointment, and (4) continue to provide clear job instructions and communication with an open exchange for questions.

79.     The Agency's decision is silent with regard to Plaintiff's request for training. The ROI does not explore the Agency's apparent denial of Plaintiff's request for training.

80.     On July 9, 2018, Plaintiff's workstation was relocated to the window spot, and he was granted a modified work schedule.

81.      The Agency offered no explanation for the 45-day interval, from May 30 to July 9, during which time it denied Plaintiff the simple accommodation of moving his desk near a window.

### G.    The Failure to Provide Reasonable Accommodations Pertaining to Clear Instruction and Open Communication

82.     Although the Agency approved Plaintiff's requests for accommodations, it failed to implement Plaintiff's request for clear instruction and open communication.

83.     The Agency never fully implemented Plaintiff's accommodations by not providing more detailed instruction.

84.     In the written progress report from May 15, 2018, Ms. Ritter stated that Plaintiff "is always happy and willing to complete work I assign to him. However, I need to communicate the same ideas two or three times before he fully understands." This statement demonstrates that Plaintiff's management was aware that he needed additional instruction and training to complete his job duties.

85.     Plaintiff asserts that after submitting the May 30, 2018, accommodations requests, he experienced more abrupt and adverse treatment. (retaliation)

86.     Plaintiff's co-worker Ms. Yarice Rodriguez observed this change. Ms. Rodriguez sat directly next to Plaintiff on the 6th floor before Plaintiff was provided with a new seating location as a reasonable accommodation.   Because of her close proximity to Plaintiff, Ms. Rodriguez observed interactions between Plaintiff and his supervisors.

87.     Ms. Rodriguez observed Ms. Ritter give Plaintiff, *at most,* one hour of training per week and typically not in a consecutive manner ("it might be fifteen minutes one day, another

13

fifteen the next day, or some days a half hour"). When Ms. Gillham became the interim supervisor, Ms. Rodriguez observed that Ms. Gillham provided roughly one and a half hours of training to Plaintiff per week.

88.     During the instances of "training," Ms. Rodriguez observed "quite a lot of eye-rolling, sighing and criticism, and not productive criticism" from Ms. Gillham to Plaintiff. Further, Ms. Rodriguez stated that Plaintiff asked many questions, which made Ms. Ritter and Ms. Gillham impatient.

89.     Ms. Rodriguez observed Ms. Gillham provide direction regarding Plaintiff's work, but only during the "heart of a program," in which Plaintiff was already submerged in the work. Much of Ms. Gillham's instruction was "not productive criticism" and resembled auditing, in which Ms. Gillham would ask, "why did you do it this way?" followed by Plaintiff's explanation, and Ms. Gillham responded that she "would have done it a different way."

90.     Ms. Ritter or Ms. Gillham failed to engage in concrete training methods to assist Plaintiff or to provide him with the supportive instruction he sought as an accommodation.

91.     Such methods should have included (1) providing a checklist, (2) pairing with another employee, (3) training, and/ or (4) closer supervision with written instruction.  Ms. Gillham terminated Plaintiff before his requests for clear instruction and training were honored. Neither Ms. Ritter nor Ms. Gillham,  neither of whom have any supervisory experience dealing with an individual with disabilities, provided the level of instruction needed for an individual with Asperger's Syndrome.

92.     The Agency failed to provide Plaintiff with adequate specialized training and provided only boilerplate instructions that it gave to all its employees.

93.     The Agency attempted to articulate that generalized training is sufficient to satisfy

Plaintiff's request for clear instruction and training. However, the Agency took little to no active steps to improve training for Plaintiff.

94.     The Agency offers several instances where the Agency purportedly provided the requested accommodations. As explained, the Agency's examples fail:

a.      On March 6, 2018, the Agency provided Plaintiff with five (5) hours of training via webinar. This training was provided to all Geography staff and was not specifically generated for Plaintiff. Thus, the Agency did not provide this training as a part of its efforts to accommodate Plaintiff.

b.      On May 21, 2018, Plaintiff requested a printout of Ms. Ritter's email, Field GSBs memo, and a webpage she linked. Ms. Ritter allegedly provided the printouts; however this single event does not constitute individualized training and instruction. Rather, it is merely answering one question that Plaintiff presented.

c.      On May 21, 2018, Ms. Ritter modified a talking script Plaintiff prepared for his PSAP phone calls. Although Plaintiff – not Ms. Ritter – prepared the script and although Ms. Ritter did not substantially change the script, she claims that her changes are "written instruction" tantamount to an accommodation.

d.      On June 28, 2018, Ms. Gillham claimed that Plaintiff did not follow instructions regarding CDP editing after "training or mentoring". However, Ms. Gillham provides no evidence of written or verbal training. Plaintiff asserts that if such training had occurred, he would have taken detailed notes.

e.      On August 2, 2018, Ms. Ritter emailed Plaintiff with vague instructions regarding LUCA electronic submission. The email includes a link to a 157-page LUCA Digital Respondent Guide and inaccurate references to certain sections of the guide.  For example,

Ms. Ritter states that the Guide, at section 4.5, identifies how to submit an electronic LUCA submission (a task assigned to Plaintiff). However, section 4.5 of the Guide does not identify this information.  The email contains unclear instructions that are not even in complete sentences. *Id*. ("If you made any road updates, the edges shapefile only containing added road features or roads with attributes modified (those records with a value in the filed 'Change Type.') Notably, Plaintiff and Ms. Rodriguez state that the Agency failed to provide a hard copy of the LUCA Guide, nor was it a "readily used known resource."

95.     The Agency gave Plaintiff no more than the bare minimal instructions.

**H.     The July 11, 2018, Meeting with Gillham**

96.     On July 11, 2018, Plaintiff set up a meeting with Ms. Gillham to discuss his progress. Plaintiff initiated this meeting.

97.     Plaintiff initiated this meeting because he was "uncomfortable with the tone of [Ms. Gillham]." This meeting was not formal counseling and would not have occurred without Plaintiff's initiative.

98.     During the meeting, Ms. Gillham criticized Plaintiff for not answering LUCA calls.  Ms. Gillham's complaint conflicted with Ms. Ritter's guidance in late May when Ms. Ritter said Plaintiff should answer LUCA calls only when his co-workers were unavailable. Plaintiff asked Ms. Gillham for more instructions for answering LUCA phone calls. When Plaintiff asked what he could read to prepare for the calls, Ms. Gillham responded disagreeably by saying, "everything… [w]e need you up to speed on everything." She gave no additional feedback or guidance.

99.     Plaintiff interpreted Ms. Gillham's actions in this meeting as hostile to an individual with disabilities, stating that he "felt like she had read about Asperger's Syndrome and was trying to make the job appear as hostile to someone like [him] as possible." Plaintiff felt anxiety during

this meeting, which Ms. Gillham seemingly noticed when she asked if he was okay.

100.    Ms. Gillham also asked Plaintiff about his use of noise-canceling headphones. Plaintiff explained: "I tell her these help me focus by blocking out excess noise as part of my sensory difficulties. Cynthia says she has a problem with this. After the meeting, I turn up the volume on my phone ringer."

101.    During this meeting, Plaintiff directly asked Ms. Gillham if he was in danger of losing his job. She responded by stating, "We are not there yet." Ms. Gillham did not inform Plaintiff that he was not performing at a Level 3 standard.

102.    Plaintiff also asked if there was a performance improvement plan, to which Ms. Gillham responded, "Just listen to what Zoe and I say/do."

103.    During the July 11 meeting, Ms. Gillham did not provide Plaintiff with a written copy of his May 15, 2018, mid-year performance review.

104.    After the meeting, Plaintiff asked Ms. Gillham if she received the email containing information about Asperger's Syndrome that Plaintiff previously sent to Ms. Ritter. Ms. Gillham responded, "in a very firm manner, 'yes,' with nothing further."

**I.      July 2018 Request for Accommodations**

105.    After his meeting with Ms. Gillham on July 11, 2018, Plaintiff spoke with the Office of Accommodations, seeking additional accommodations. The Office told Plaintiff that the Agency should have given him the mid-year evaluation in May.

106.    On July 11, 2018, Plaintiff emailed the Reasonable Accommodations Branch to address certain areas in which improvement was requested in the progress report. Plaintiff stated:

> I do, however, have some other concerns as it pertains to my ability to meet the performance standards of the job given my medical condition. Would your office be the one which I should be in touch, or should I reach out to employee relations or some other office?

17

107.    On July 11, 2018, Ms. Stephanie Watson, the Chief of the Reasonable Accommodations Branch, responded to Plaintiff's email by stating that "[a]ccording to guidelines an employee has to be able to perform the essential functions of the position either with or without an accommodation. We have no authority when it comes to performance or conduct. My suggestion would be to contact the call center.".

108.    In July 2018, and after many requests, the Agency finally provided Plaintiff his May 15 written mid-year progress report after months of requesting it.  The Agency fails to articulate a reason for the two-month delay in providing a written copy of the progress report to Plaintiff. The mid-year report does not rate Plaintiff at any particular "Level." In the mid-year report, Ms. Ritter states that she had instructed Plaintiff to answer LUCA support calls but that Plaintiff does not. As noted above, after the May 15 meeting, Ms. Ritter told Plaintiff that he did not have to regularly answer LUCA calls and could merely take a message.  Ms. Ritters notes areas for improvement:   (1) answer LUCA calls, (2) read and understand program documents, and (3) ask questions if he does not understand program guidelines and procedures.

109.    The report offers no action plan to assist.  Ms. Ritter also complains:  "I need to communicate the same ideas two or three times before he fully understands…"

110.    Not until Plaintiff contacted Stephanie Watson in July did he learn that his supervisor should have explained the importance of Level 3 and that he was expected to perform at a Level 3 or better. Prior to about July 16, Agency failed to explain the importance of "Level 3" performance and did not put Plaintiff on notice that he was not performing at Level 3.

111.    On July 16, 2018, Plaintiff again emailed Ms. Watson, stating, "I have received a copy of my progress review. There are some areas that I have concern about and feel an accommodation would better help me get up to where I need to be."

18

112.    On July 17, 2018, Ms. Watson responded to Plaintiff's email, stating, "I highly encourage you to engage in the interactive process with your Supervisor. Again, a reasonable accommodation cannot lower performance standards. Below you stated that an accommodation would help you to get where you need to be. Is that in regard to your performance?"

113.    On July 17, 2018, Plaintiff responded to Ms. Watson in the Accommodation Office.  Plaintiff stated:

> "I think the performance standards can be met, but there do need to be some modifications in terms of coaching/instruction and mentorship.
>
> Our specific division is kind of unique, we do not have a full-time regular supervisor. Instead, since March we have had interim supervisors for 3-month terms who have never been supervisors before. The person in charge of all of us works remotely out of state. Hence, I am not with experienced senior staff and it was kind of hoped individuals would be more self-sufficient."

114.    On July 17, 2018, Plaintiff and Ms. Watson had a phone call to discuss the requested accommodations. During the call, Ms. Watson informed Plaintiff that the Agency does not have the resources to provide a job coach and told him that the requested accommodation was "too burdensome." The Agency offers no evidence to support this conclusion.

115.    When the Agency determines that a requested accommodation is an undue burden, the Agency's RA procedures require that the deciding official should continue the interactive process until either a reasonable accommodation is found or the deciding official determines that the accommodation is not possible. The Agency did not do that. After July 17, 2018, the Agency took no action to accommodate Plaintiff or enter into an interactive process.

### J.  The Agency Terminated Plaintiff Before Providing Accommodations or Engaging in the Interactive Process

116.    On August 24, 2018, Ms. Lisa Moore called Plaintiff to a meeting, where joined by Ms. Gillham, she provided Plaintiff with a notice of termination for "unacceptable performance," effective immediately. Ms. Gillham was the primary decision-maker regarding Plaintiff's

termination.

117.    The termination letter only re-states the mid-year evaluation's criticisms:

During your progress review held on May 15, 2018, you were notified of
deficiencies in the critical elements of your Performance Management Record
(PMR). Specifically, regarding Critical Element 1, "Customer Service", you have
not answered Local Update of Census Addresses (LUCA) support calls as
requited. With regard to Critical Element 2, Geographic Support', you do not
demonstrate a thorough understanding of the Participant Statistical Area Program
(PSAP) Census Designated Places (CDPs) and they are not being reviewed
according to established guidelines. Additionally, you failed to ask questions when
conducting CDP reviews when you were unsure of the necessary edits.

118.    The August termination notice identifies no performance deficiencies that post-date

Plaintiff's May 15 mid-year evaluation, nor does it incorporate any efforts by management to

address Plaintiff's alleged performance deficiencies or his accomplishments after May 15.

119.    By the time that Plaintiff was terminated, the call-answering portion of the LUCA

project had been completed for over a month.  The only calling that was done was follow-up

requests that the staff initiated.  Plaintiff had been eagerly partaking in these calls, as unlike call

answering, the calls were in response to an already identified problem which the Plaintiff could

research and prepare for in advance.

120.    Additionally, with LUCA winding down, the workload switched to include more

mapping, which is one of Complaint's strengths.  Thus, his dismissal and the reason given were

pretextual.

121.    Further, the May 15, 2018, progress review, from which the basis for termination

stems, occurred prior to Plaintiff's formal request for reasonable accommodations. Plaintiff was not

provided with the opportunity to benefit from the reasonable accommodations, nor were they

provided fully by management before termination.

122.    After the termination meeting, Ms. Moore did not allow Plaintiff to email himself

any notes he took while working for the Agency or any evidence of his prior satisfactory work.

123.    Ms. Rodriguez stated that there is no evidence of negative feedback from Headquarters after reviewing Plaintiff's CDP work, which supports the assertion that Ms. Ritter and Ms. Gillham's criticism of Plaintiff was disingenuous and pretextual.

124.    Plaintiff was terminated before his request for modifications of instruction and provision of a mentor/ job coach was met. Plaintiff was never given an ample opportunity to meet the essential functions of his job with accommodations. The Agency failed to provide Plaintiff with an opportunity to meet performance standards with his reasonable accommodations. The Agency did not provide a mentor or a job coach, detailed instruction, training, and opportunities for questions as he repeatedly requested in May and July  30.

125.    Plaintiff asserts that his association with Rodriguez and Adams caused management to have additional concerns about him.

126.    Additionally, the Agency wrongfully dismissed Plaintiff's request on July 17, 2018, for modified instruction and a job coach. The Agency offered no evidence – other than a conclusory statement – to support its claim that a job coach would be an undue burden.

### FIRST CLAIM FOR RELIEF - DISCRIMINATION UNDER THE ADA

127.    Plaintiff realleges the preceding paragraphs as if set forth here.

128.    Plaintiff is a qualified individual within the meaning of the ADA (42 U.S.C. § 12111(8)). Plaintiff reported his disability and requested medical accommodations regarding his disability.

129.    Defendants discriminated against Plaintiff on the basis of his disability and perceived disability and by failing to reasonably accommodate and retaliating against Plaintiff for requesting an accommodation as set forth above, which in turn caused his termination.

130.     As a direct and proximate result of Defendants' unlawful discrimination, Plaintiff suffered and will continue to suffer harm, including but not limited to a loss of employment opportunities, humiliation, embarrassment, reputational harm, emotional, physical, and psychological distress, and other damages.

**SECOND CLAIM FOR RELIEF - 504 OF THE REHABILITATION ACT**

131.     Plaintiff repeats and realleges each and every preceding paragraph as if fully set forth at length herein.

132.     The Defendants violated the Rehabilitation Act, 29 U.S.C. Section 504, et seq. by Defendants discriminating against Plaintiff on the basis of his disability and perceived disability and by failing to reasonably accommodate and retaliating against Plaintiff for requesting an accommodation as set forth above, which in turn caused his termination.

133.     As a direct and proximate result of Defendants' unlawful discrimination, Plaintiff suffered and will continue to suffer harm, including but not limited to a loss of employment opportunities, humiliation, embarrassment, reputational harm, emotional, physical, and psychological distress, and other damages.

**PLAINTIFF HEREIN DEMANDS A TRIAL BY JURY**

WHEREFORE, the Plaintiff herein, Trent Berger, demands judgment as follows:

A.     Declaring that Defendants engaged in unlawful employment practices prohibited by the ADA and 504.

B.     Judgment for economic losses and compensatory damages in an amount not yet determined by a jury.

C.     Reasonable attorney's fees.

D.     Pain and Suffering, and emotional damages stemming from this action.

E.     Any other relief this Court deems appropriate.

22

Dated: New York, New York
      August 07, 2023

                    Respectfully submitted,

                    STEWART LEE KARLIN
                    LAW GROUP, P.C.

                    _____
                    Stewart Lee Karlin, Esq.
                    Natalia Kapitonova, Esq.
                    *Attorneys for Plaintiff*
                    111 John St., 22nd Floor
                    New York, NY 10038
                    (212) 792-9670
                    slk@stewartkarlin.com
                    cnk@stewartkarlin.com