```
┌─────────────────────────────────┐
│ USDC SDNY                       │
│ DOCUMENT                        │
│ ELECTRONICALLY FILED            │
│ DOC #:_____           │
│ DATE FILED:  03/27/2025         │
└─────────────────────────────────┘
```

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

Trent Berger,

                    Plaintiff,

          -against-

U.S. Department of Commerce, et al.,

                    Defendants.

1:22-cv-10257 (GHW) (SDA)

**REPORT AND RECOMMENDATION**

**STEWART D. AARON, UNITED STATES MAGISTRATE JUDGE.**

**TO THE HONORABLE GREGORY H. WOODS, UNITED STATES DISTRICT JUDGE:**

Before the Court is a motion for summary judgment by Defendants U.S. Department of Commerce ("Commerce Department") and Howard Lutnick, Secretary of U.S. Department of Commerce[1] ("Secretary Lutnick," and together, the "Defendants"), seeking to dismiss the Amended Complaint of Plaintiff Trent Berger ("Plaintiff" or "Berger").[2] (Defs.' Not. of Mot., ECF No. 61.)

For the reasons set forth below, it is respectfully recommended that Defendants' motion for summary judgment be GRANTED IN PART and DENIED IN PART.

---

[1] At the time that this action was commenced, Gina M. Raimondo ("Raimondo") was Secretary of the U.S. Department of Commerce. At present, Howard Lutnick ("Lutnick") serves in that position. Accordingly, pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Lutnick is substituted in place and stead of Raimondo. The Clerk of Court is respectfully requested to update the caption on the ECF docket.

[2] In making its recommendations herein, the Court has considered Defendants' memorandum of law (Defs.' Mem., ECF No. 62); Defendants' Rule 56.1 Statement (Defs.' 56.1, ECF No. 63); the Declaration of Ilan Stein (Stein Decl., ECF No. 64); Plaintiff's 56.1 Counterstatement (Pl.'s 56.1, ECF No. 69); the Declaration of Trent Berger (Berger Decl., ECF No. 70); Plaintiff's Opposition Memorandum (Pl.'s Opp., ECF No. 72); the Declaration of Natalia Kapitonova (Kapitonova Decl., ECF No. 73); and Defendants' reply memorandum. (Defs.' Reply, ECF No. 74.)

**RELEVANT FACTS[3]**

I.    **Berger's Disability**

Berger has been diagnosed with Asperger's Syndrome, a neurological condition that affects his ability to interact with others, think, learn, sleep, concentrate and work.[4] (Defs.' 56.1 ¶ 1; Pl.'s 56.1 ¶ 1.) He also suffers from social anxiety and obsessive-compulsive disorder ("OCD"). (*Id*.) According to his psychiatrist, Dr. Imran Akram, Berger is very functional at baseline, but during stress his functioning worsens. (Defs.' 56.1 ¶ 2; Pl.'s 56.1 ¶ 2.) Berger's autism, OCD and anxiety make it difficult for him to adhere to a rigid work schedule, such that some flexibility in work hours to accommodate medical and psychotherapy appointments would be beneficial. (*Id*.) Dr. Akram also points out that Berger's limitations include poor sleep leading to poor concentration and energy during the day. (Ex. A to Stein Decl., ECF No. 64-1, at USA_0252; *see also* Defs.' 56.1 ¶ 2; Pl.'s 56.1 ¶ 2.)

Berger acknowledges that, on account of his disability, he cannot be described as a quick learner. (Defs.' 56.1 ¶ 3; Pl.'s 56.1 ¶ 3.) If a lot of information is disseminated quickly, he may have difficulties immediately processing, retaining and absorbing the information (*Id*.) He needs things explained to him more methodically and must write down a "manual" of information. (*Id*.)

---

[3] The relevant facts are derived from the parties' 56.1 Statements and the documentary evidence submitted in support of and in opposition to the pending motion.

[4] Berger was diagnosed with Asperger's Syndrome in 2006. (Berger Decl. ¶ 5.) "Asperger's Syndrome is a developmental disorder akin to autism with the following characteristics: Language and cognition generally better than in autism; socially isolated and often viewed as odd or eccentric; clumsiness; repetitive patterns of behavior, interests, and activities; atypical sensory responses (e.g., exquisite sensitivity to noises, food odors or tastes, or clothing textures); pragmatic deficits (e.g., extremely concrete use of language or difficulty recognizing irony or jokes)." *Marthens v. Colvin*, No. 3:15-CV-00535 (CFH), 2016 WL 5369478, at *6 n.13 (N.D.N.Y. Sept. 22, 2016) (internal quotation marks and citations omitted).

## II.    <u>Berger's Employment At Census Bureau</u>

Berger began working at the Census Bureau[5] on January 25, 2018 as a Geographic Specialist ("Geographer")[6] stationed at the New York Regional Census Center. (Defs.' 56.1 ¶ 4; Pl.'s 56.1 ¶ 4.) Berger applied and was hired as a Schedule A appointee. (Berger Decl. ¶ 16.) Schedule A is a federal hiring program for people with disabilities.[7] (*Id*.) In his application, Berger disclosed his Asperger's Syndrome diagnosis. (*Id*.)

Berger was hired as a Geographer to assist with the 2020 Decennial Census—*i.e*., the legally mandated census that takes place every ten years. (Pl. Tr., ECF No. 73-1,[8] at 48:25-49:13; Ritter Tr., ECF No. 73-2,[9] at 12:20-13:11.) The appointment was subject to a two-year probationary period. (Ex. C to Stein Decl., ECF No. 64-3, at USA_0197; *see also* Pl. Tr. at 50:9:-51:20.) Berger understood that his position was temporary in nature, but he hoped that when the work for decennial ended, he would be able to transfer with his experience to some other permanent position with the Census Bureau. (Pl. Tr. at 54:19-55:14.)

Geographers' major duties included providing explanations regarding census programs, preparing responses to written inquiries, providing advice and assistance to local officials on

---

[5] The Census Bureau is part of the U.S. Department of Commerce. U.S. Census Bureau website, Who We Are, as of Mar. 7, 2025, available at https://perma.cc/3HYZ-CLPD.

[6] Geographers are key to the decennial census operation as they access geographic plans and specifications throughout America. (Defs.' 56.1 ¶ 6; Pl.'s 56.1 ¶ 6.) By collecting statistical methodology and data collection, Geographers plan and implement geographic census and survey operations. (*Id*.)

[7] "In the non-competitive hiring process, agencies use a special authority (Schedule A) to hire persons with disabilities without requiring them to compete for the job." U.S. Office of Personnel Management website, *Hiring*, as of Mar. 7, 2025, available at https://perma.cc/YS8K-PS3T (emphasis omitted).

[8] Excerpts from the transcript of Plaintiff's deposition were filed by Defendants at ECF No. 64-4. The entire transcript was filed by Plaintiff at ECF No. 73-1.

[9] Excerpts from the transcript of deposition of Zoe Ritter ("Ritter") were filed by Defendants at ECF No 64-5. The entire transcript was filed by Plaintiff at ECF No. 73-2.

questions related to Census Bureau geographic and statistical methodology and acquiring additional address lists from tax offices, city engineers, local planning agencies, utility companies, etc. (Defs.' 56.1 ¶ 7; Pl.'s 56.1 ¶ 7.) Geographers' other duties included developing maps and analytical products, and providing customer support to state and local governments who were participating in programs to improve census address and boundary data. (Defs.' 56.1 ¶ 8; Pl.'s 56.1 ¶ 8.) Geographers' duties also included conducting research, analyzing census data, and updating maps, creating tracking spreadsheets, and engaging in outreach to potential Participant Statistical Areas Program ("PSAP") program participants and conducting phone interviews for Local Updated Census Addresses ("LUCA"). (*Id*.)

Berger's duties included answering incoming calls regarding the LUCA program. (Pl. Tr. at 59:2-60:7-10.) Telephone calls were a big part of the LUCA program. (Defs.' 56.1 ¶ 95; Pl.'s 56.1 ¶ 95.) The types of questions that Berger received from outside stakeholders in telephone calls he received were not predictable. (Pl. Tr. at 61:14-62:8.) Follow ups to those telephone calls, however, were quite predictable. (*Id*. at 62:6-62:8.) Berger at times found that his job could be stressful. (*Id*. at 82:7-8.) When he was hired, Berger was trained on the LUCA program. (Defs.' 56.1 ¶ 54; Pl.'s 56.1 ¶ 54.) He also attended LUCA Technical Webinars and was provided time to review the webinars. (*Id*.) In addition, Berger and the rest of the Geography staff were trained on outreach related to the PSAP, including initial contact scripts. (*Id*.)

During Berger's time at the Census Bureau, he had two first line supervisors. (Defs.' 56.1 ¶ 17; Pl.'s 56.1 ¶ 17.) Ritter became his acting supervisor in February 2018. (Ritter Tr. at 12:7-8.) In July 2018, Cynthia Gillham ("Gillham") replaced Ritter as acting supervisor. (Defs.' 56.1 ¶ 20; Pl.'s 56.1 ¶ 20.)

III.    **May 2018 Progress Review And Request For Reasonable Accommodations**

On May 15, 2018, Berger received a progress review. (Defs.' 56.1 ¶ 96; Pl.'s 56.1 ¶ 96.)

Berger met with Ritter, who informed him that his progress was not satisfactory and notified him

of deficiencies in Customer Service and Geographic Support. (*See* Progress Review, Ex. R to Stein

Decl., at USA_0210; *see also* Defs.' 56.1 ¶¶ 96-97; Pl.'s 56.1 ¶¶ 96-97.) In the review, Berger was

informed of his failure to answer LUCA support calls and to fully comprehend/review assignments

and of his lack of reference to procedural memoranda. (Progress Review at USA_0210.) At the

May 15 meeting, Berger informed Ritter that he had been hired under the Schedule A hiring

program, described to her how Asperger's Syndrome might affect him in the job, and told her

that he required more detailed instructions. (Berger Decl. ¶ 54-55.) Berger was not provided with

a copy of his performance review at the May 15 meeting. (Berger Decl. ¶ 56.) After the May 15,

2018 meeting, Berger sent information to Ritter regarding Asperger's Syndrome and the

workplace. (*Id*. ¶ 53.)

Later in May 2018, Berger emailed Ritter to confirm her receipt of the Asperger's

Syndrome information. (Berger Decl. ¶ 57.) According to Berger, in response, Ritter told him that

he did not need to regularly answer LUCA calls, stating that she understood why "answering 'cold'

phone calls from partners without more extensive training" would be difficult for him, and Ritter

instructed him to work on the PSAP Census Designated Places review, and to answer LUCA calls

and take a message only when the rest of the team was busy. (*Id*.) Ritter contends that, after the

May 15, 2018 meeting, she started providing more detailed instruction, both verbally and in

writing. (Ritter EEOC Aff., Ex. H to Stein Decl., ECF No. 64-8, at USA_0144). Berger denies that

these instructions were adequate. (Defs.' 56.1 ¶ 99; Pl.'s 56.1 ¶ 99.)

At the end of May 2018, the team of Geographers moved to a new workspace on a different floor of the same building. (Defs.' 56.1 ¶ 29; Pl.'s 56.1 ¶ 29.) Berger asked Ritter the day before or the day of the move if he could relocate his workspace closer to a window and away from a florescent light. (*Id*.) In response, according to Ritter, she asked Berger "to wait a week or so to see how it went" (Ritter 2/20/19 Aff., ECF No. 64-8, at 2), and, according to Berger, Ritter said to "wait a couple of weeks." (Berger Decl. ¶ 63.)

On May 30, 2018, Berger submitted a written Request for Reasonable Accommodations.[10] (Ex. K to Stein Decl., ECF No. 64-11.) In that document, Berger expressly requested two accommodations: (1) to be "seated in a corner spot by the window where there are fewer auditory distractions and more natural light," and (2) to "get some flexibility" in his work schedule so he could attend "at least one if not two or more medical appointments a week." (*Id*. at USA_0254.) In addition, in that document, Berger stated that he was "somewhat concerned about [his] most recent evaluation," expressed concern that, "due to the unpredictable, unscripted nature of LUCA support, and [his] comfort and comp[etence] in more scripted, repetitive, predictable tasks," his difficulty with answering phone calls relating to LUCA "may keep [him] from advancing," but stated that "[n]o accommodation [was] requested in regards to

---

[10] The Commerce Department's administrative order "Reasonable Accommodation for Employees or Applicants with Disabilities," Departmental Administrative Order 215-10, outlines the Department's reasonable accommodation policy. (Defs.' 56.1 ¶ 25; Pl.'s 56.1 ¶ 25.) The reasonable accommodation process begins when an employee makes a request for a change or identifies a barrier. (*Id*.) Typically, a reasonable accommodation request should be approved or denied within twenty (20) business days from when the request is made, or if the request requires medical documentation, twenty business days from when all documentation is received. (Defs.' 56.1 ¶ 26; Pl.'s 56.1 ¶ 26.) Accommodations should be provided within ten business days of approval. (*Id*.) A staff member in the Reasonable Accommodations Branch makes a recommendation as to whether to grant or deny a request for reasonable accommodation, but the requestor's supervisor makes the ultimate decision on whether to grant or deny a request for reasonable accommodation. (Defs.' 56.1 ¶ 27; Pl.'s 56.1 ¶ 27.)

this persay [sic], but [Berger] just wanted to get out in front so [he] can fully meet all expectations as a team player."[11] (*Id.*) According to Berger, Ritter called him within ten minutes of his submission of the request, asking him why he did so and expressing concern that he submitted a formal request. (Berger Decl. ¶ 67.)

Dr. Akram submitted paperwork related to Berger's request for reasonable accommodations, which Dr. Akram signed on June 8, 2018. (Medical Form re Accommodation Request, Ex. A to Stein Decl., at USA_0252.) In response to a question seeking "specific suggestions . . . regarding possible accommodations," Dr. Akram wrote: "Continuing with clear job instructions, better communication, encouragement to ask questions, less distractive work environment. More natural light exposure and limited florescent light exposure." (*Id.*)

IV.    **Response To Request For Reasonable Accommodations**

On June 27, 2018, at 11:50 a.m., Stephanie Watson ("Watson"), who at the time was Chief of the Reasonable Accommodations Bureau in the Human Resources Division at the Census Bureau, sent an email to Berger, setting forth the reasonable accommodations that had been approved for Berger, as follows:

> Allow the employee to sit/work, in a corner spot by a window with natural lighting.
>
> Allow the employee to have a less distracted work area.
>
> Allow the employee to make up one, (1) hour weekly due to an early departure for a medical appointment, due to the medical condition for which this accommodation is approved. (The one, (1) hour may exceed the core hour rules, exclusively for this accommodation, only.[)]

---

[11] In his Declaration, Berger states that he also requested "more clarity and training" (Berger Decl. ¶ 65), but this request is not included in the May 30, 2018 document. (*See* Ex. K to Stein Decl. at PDF pp. 1-2.)

Continue to provide clear job instructions, communication, with an open exchange for questions.

(Watson 6/27/18 Email, Ex. L to Stein Decl., ECF No. 64-12, at PDF p. 7.) Watson's email listed the date of approval as June 27, 2018; the date of implementation was "[a]t the discretion of the manager and NLT 7/13/18." (*Id*.) Watson's email also noted Berger's right to appeal if he was dissatisfied with the decision, as well as other rights he could pursue. (*See id*. at PDF pp. 7-8.) On June 27, 2018, at 4:07 p.m., Berger responded to Watson's email stating, "Thank you very much Stephanie!" (Berger 6/27/18 Email, Ex. L to Stein Decl., at PDF p. 6.) On July 9, 2018, Berger's workstation was relocated to the window spot, and he was granted a modified work schedule. (Berger Decl. ¶ 70.)

**V.    July 2018 Communications And Further Requests For Accommodations**

On July 11, 2018, Berger initiated a meeting with Gillham, who had replaced Ritter by this time, to discuss his job progress. (Berger Decl. ¶¶ 86-87; *see also* Defs.' 56.1 ¶ 100; Pl.'s 56.1 ¶ 100.) Berger's account of this meeting, as reflected in his sworn Declaration, differs from Gillham's account, as expressed in her notes of the meeting. (*Compare* Berger Decl. ¶¶ 86-92, *with* Gillham Notes, Ex. N to Stein Decl., ECF No. 64-14.) Berger states that Gillham criticized him for not answering LUCA calls, even though Ritter had told him that he should answer LUCA calls only when his co-workers were unavailable. (Berger Decl. ¶ 88.) Then, when Berger asked her what he could read to prepare for the calls, Gillham stated that Berger needed to be "up to speed on everything," and gave no additional feedback or guidance (*Id*.) In contrast, Gillham's notes regarding the July 11, 2018 meeting state:

Trent [Berger] demonstrated that he did not understand the LUCA program well enough to answer a question on the phone. He transferred the call to a coworker

to be answered. Trent was provided additional guidance one-on-one, on how the call needed to be resolved.

(Gillham Notes at USA_237.)

On July 11, 2018, at 4:52 p.m., Berger sent an email to Watson stating:

Thanks again for your help, I did get a desk re-assignment that is very nice.

I do however have some other concerns as it pertains to my ability to meet the performance standards of the job given my medical condition.

Would your office be the one which I should be in touch, or should I reach out to employee relations or some other office?

(Berger 7/11/18 Email, Ex. L to Stein Decl., at PDF p. 5.) The same day, at 5:22 p.m., Watson

replied, stating:

According to guidelines an employee has to be able to perform the essential functions of the position either with or without an accommodation. We have no authority when it comes to performance or conduct. My suggestion would be to contact the call center.

(Watson 7/11/18 Email, Ex. L to Stein Decl., at PDF p. 4.)

In July 2018, after many requests, Berger finally was provided with a copy of his May 15

performance review. (Berger Decl. ¶ 98.) On July 16, 2018, Berger sent an email to Watson,

stating:

I have received a copy of my progress review.

There are some areas that I have concern about and feel an accommodation would better help me get up to where I need to be.

Would you like me to send you a copy of the review, and should we set up a time to talk?

(Berger 7/16/18 Email, Ex. L to Stein Decl., at PDF p. 4.) On July 17, 2018, at 7:30 a.m., Watson

replied, as follows:

**Please do not send me your progress review.**

9

> My role in this process is to act as an impartial advisor. The deciding official for a reasonable accommodation is your Supervisor. I highly encourage you to engage in the interactive process with your Supervisor. Again, a reasonable accommodation cannot lower performance standards. Below you stated that an accommodation would help you to get where you need to be. Is that in regards to your performance?
>
> If you are available today at 4:00 I am happy to talk. Please let me know if this time is convenient for your schedule. I will also have documentation sent today so you can request another accommodation, if appropriate.

(Watson 7/17/18 Email #1, Ex. L to Stein Decl., at PDF p. 3 (emphasis in original).) On July 17, 2018, at 9:19 a.m., Berger sent an email in response to Watson's email from earlier that morning, stating:

> I think the performance standards can be meet [sic], but there do need to be some modifications in terms of coaching/instruction and mentorship.
>
> Our specific division is kind of unique, we do not have a full time regular supervisor. Instead, since March we have had interim supervisors for 3 month terms who have never been supervisors before.
>
> The person in charge of all of us works remotely out of state. Hence, I am not with experienced senior staff and it was kind of hoped individuals would be more self-sufficient.
>
> I can talk today at 4, but I am leaving the office at 4:30.
>
> Would you have anytime to talk tomorrow?

(Berger 7/17/18 Email, Ex. L to Stein Decl., at PDF p. 2.) At 2:10 p.m., Watson responded, as follows:

> If it's convenient, may we please talk at 4:00? If we need to continue the conversation due to your departure we can schedule another meeting. I also asking my Senior [Reasonable Accommodation Coordinator] to attend the meeting, (Melissa Gibson). Please let me know if this works for today?

(Watson 7/17/18 Email #2, Ex. L to Stein Decl., at PDF p. 1.)

10

On July 17, 2018, Berger, Watson and Gibson spoke by telephone. (Berger Decl. ¶ 104; *see also* Gibson 7/17/18 Email, Ex. L to Stein Decl., at PDF p. 1.) According to Berger, Watson informed him during the call that the Census Bureau did not have the resources to provide a job coach and told him that his requested accommodation was too burdensome. (Berger Decl. ¶ 104.) Throughout July and August 2018, Defendants contend that Berger was provided with a variety of one-on-one training opportunities, which Berger denies. (Defs.' 56.1 ¶¶ 68-77; Pl.'s 56.1 ¶¶ 68-77; *see also* Berger Decl. ¶¶ 84-85.)

**VI.**    **August 24, 2018 Termination And Aftermath**

On August 24, 2018, Berger's employment was terminated by Gillham. (*See* Defs.' 56.1 ¶ 104; Pl.'s 56.1 ¶ 104.) The first three paragraphs of the termination letter read, as follows:

> On January 25, 2018, you were given an excepted service temporary appointment Not-To-Exceed September 25, 2020, as a Geographic Specialist, 00-0301-11/01 on August 5, 2018 you were converted to a Geographer GG-0150-ll/l, with the U.S. Census Bureau (Census Bureau), New York Regional Census Center (NYRCC). I am terminating your appointment for Unacceptable Performance.

> During your progress review held on May 15, 2018, you were notified of deficiencies in the critical elements of your Performance Management Record (PMR). Specifically, regarding Critical Element 1, "Customer Service", you have not answered Local Update of Census Addresses (LUCA) support calls as required. With regard to Critical Element 2, "Geographic Support", you do not demonstrate a thorough understanding of the Participant Statistical Area Program (PSAP) Census Designated Places (CDPs) and they are not being reviewed according to established guidelines. Additionally, you failed to ask questions when conducting CDP reviews when you were unsure of the necessary edits.

> Based on your unacceptable performance, I do not consider it in the best interest of the Government to retain you in the Federal service. Accordingly, I am terminating you from your appointment as a Geographer and the Federal service effective August 24, 2018- I am taking this action to promote the efficiency of the Service.

(Gillham 8/24/18 Ltr., Ex. S to Stein Decl., ECF No. 64-19.)

Thereafter, Berger unsuccessfully pursued a complaint with the Government's Equal Employment Opportunity Office. (Defs.' 56.1 ¶¶ 110-15; Pl.'s 56.1 ¶¶ 110-15.) Berger then filed this action, in which he alleges claims under the Section 504 of the Rehabilitation Act.[12]

## LEGAL STANDARDS

### I.    Summary Judgment

Summary judgment is appropriate where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-50 (1986). The moving party has the initial burden of demonstrating the absence of a disputed issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 321-23 (1986). A dispute concerning material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d 520, 523 (2d Cir. 1992) (quoting *Anderson*, 477 U.S. at 248). In making its determination, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *See Anderson*, 477 U.S. at 255.

---

[12] Berger also alleged claims under the Americans with Disabilities Act ("ADA"). However, those claims fail as a matter of law because federal employees have "no remedy for employment discrimination under the ADA." *Rivera v. Heyman*, 157 F.3d 101, 103 (2d Cir. 1998); *see also* 42 U.S.C. § 12111(5)(B) (providing that ADA definition of "employer" excludes United States). A federal employee only may seek a remedy for alleged disability discrimination or retaliation under the Rehabilitation Act of 1973. *See Stephens-Buie v. Shinseki*, No. 09-CV-02397 (LBS), 2011 WL 2574396, at *2 n.1 (S.D.N.Y. June 27, 2011) ("[A] federal government employee's sole claim for discrimination on the basis of disability is under the Rehabilitation Act, if anywhere." (internal quotation marks omitted)). Accordingly, I recommend that claims asserted by Plaintiff under the ADA be dismissed with prejudice. *See Atencio v. U.S. Postal Serv.*, No. 14-CV-07929 (GHW), 2015 WL 7308664, at *5 (S.D.N.Y. Nov. 19, 2015) (dismissing ADA claims brought by federal employee). "Nonetheless, to determine whether employers have violated the Rehabilitation Act, courts use the standards set forth in the ADA." *Id.* (cleaned up); *see also Earl v. Good Samaritan Hosp. of Suffern NY*, No. 22-2505-CV, 2023 WL 8708417, at *1 (2d Cir. Dec. 18, 2023) (citing *Rodriguez v. City of New York*, 197 F.3d 611, 618 (2d Cir. 1999)) (noting "identical requirements" of Section 504 and ADA); *Hodges v. Holder*, 547 F. App'x 6, 7-8 (2d Cir. 2013) ("Because the ADA and the Rehabilitation Act are very similar, we may look to caselaw interpreting one statute to assist us in interpreting the other.") (cleaned up).

To defeat summary judgment, it is not sufficient for the non-moving party to present evidence that is conclusory or speculative, with no basis in fact. *See Anderson*, 477 U.S. at 249-50. Indeed, the non-moving party must go beyond the pleadings and "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Instead, the nonmoving party must present "specific facts showing that there is a genuine issue for trial." *Beard v. Banks*, 548 U.S. 521, 529 (2006) (quoting Fed. R. Civ. P. 56(e)).

## II.    Disability Discrimination Under The Rehabilitation Act

Section 504 of the Rehabilitation Act provides that

> [n]o otherwise qualified individual with a disability . . .shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance. . ..

29 U.S.C. § 794(a). Disability discrimination claims may be brought under a theory of failure to provide reasonable accommodation or of adverse employment action. *See Balchan v. New York City Hous. Auth.*, No. 21-CV-10326 (JGK), 2025 WL 588021, at *5 (S.D.N.Y. Feb. 24, 2025).

To make out a *prima facie* case for failure to accommodate under the Rehabilitation Act, an employee must allege that "(1) [he] is a person with a disability under the meaning of the [Rehabilitation Act]; (2) an employer covered by the statute had notice of his disability; (3) with reasonable accommodation, [he] could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations." *Noll v. Int'l Business Machines Corp.*, 787 F.3d 89, 94 (2d Cir. 2015) (quotation omitted). "As to the fourth element, the Rehabilitation Act 'contemplates that employers will engage in an interactive process with their employees and in that way work together to assess whether an employee's disability can be

reasonably accommodated.'" *Perkins v. City of New York*, No. 22-196-CV, 2023 WL 370906, at *3 (2d Cir. Jan. 24, 2023) ) (quoting *Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 125, 127 (2d Cir. 2008)). "When making a claim based on a failure to accommodate, 'the plaintiff bears the burdens of both production and persuasion as to the existence of some accommodation that would allow him to perform the essential functions of his employment.'" *Bey v. City of New York*, 999 F.3d 157, 165 (2d Cir. 2021) (quoting *McMillan v. City of New York*, 711 F.3d 120, 126 (2d Cir. 2013)). "Once a plaintiff suggests plausible accommodations, the burden of proof shifts to the defendant to demonstrate that such accommodations would present undue hardships and would therefore be unreasonable." *Id.* (cleaned up). "[F]ailure-to-accommodate claims do not require proof of discriminatory intent." *Kleyman v. SUNY Downstate Med. Ctr.,* No. 18-CV-93137 (PKC) (ST), 2020 WL 5645218, at *8 (E.D.N.Y. Sept. 21, 2020) (quoting *Brooklyn Ctr. for Psychotherapy, Inc. v. Phila. Indem. Ins. Co.*, 955 F.3d 305, 312 (2d Cir. 2020)).

Discrimination claims based on adverse employment action brought pursuant to the Rehabilitation Act are assessed under the familiar burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). *See Benson v. Westchester Medical Center*, No. 20-CV-05076 (PMH), 2022 WL 2702544, at *10 (S.D.N.Y. July 12, 2022). Under this analysis, the plaintiff must first proffer evidence establishing a *prima facie* case of discrimination. To do so, a plaintiff must demonstrate that "(i) [his] employer is subject to the [Rehabilitation Act], (ii) Plaintiff is a disabled person as defined by the [Rehabilitation Act], (iii) [he] is 'otherwise qualified' for the position (meaning that [he] could perform the essential functions of [his] job with or without reasonable accommodation), and (iv) [he] suffered an adverse employment action because of [his] disability." *Edwards v. Wilkie*, No. 16-CV-08031 (LTS) (OTW), 2020 WL

2792997, at *9 (S.D.N.Y. May 29, 2020) (citation omitted). Once a plaintiff meets this burden, the burden shifts to the employer to offer some legitimate, non-discriminatory reason for its actions. *See Balchan*, 2025 WL 588021, at *5. "If the employer successfully meets its burden, the plaintiff must then demonstrate that the employer's assigned reason was a pretext or discriminatory in its application." *Id.*

These frameworks also may overlap. *See Piligian v. Ichan Sch. of Med. at Mount Sinai*, No. 17-CV-01975 (ALC) (SDA), 2020 WL 6561663, at *5 (S.D.N.Y. Apr. 7, 2020), *report and recommendation adopted*, 490 F. Supp. 3d 707 (S.D.N.Y. 2020). When a plaintiff asserts that an adverse employment action is tied to an employer's failure to accommodate, the employer's failure to accommodate may serve as evidence of discriminatory intent. *See McMillan*, 711 F.3d at 129; *see also Kleyman*, 2020 WL 5645218, at *12 ("failure to accommodate may indeed be an element of an adverse-employment-action-based discrimination claim in addition to forming an independent cause of action").

"The traditional *McDonnell Douglas* burden-shifting framework, which is 'used to weed out non-viable claims of discrimination based on circumstantial evidence[,]' is 'not helpful' in this context." *Piligian*, 2020 WL 6561663, at *5 (quoting *McMillan*, 711 F.3d at 129 (pretext not issue when employer disciplined employee because of tardiness, which parties agreed was direct result of employee's disability)). However, a plaintiff asserting a claim based both on an adverse employment action and a failure to accommodate also must demonstrate "the connections" between (1) an employer's failure to accommodate a disability, (2) the plaintiff's performance

15

deficiencies, and (3) the adverse employment action. *See Natofsky v. City of New York*, 921 F.3d 337, 352 (2d Cir. 2019).[13]

### III.    Retaliation Under The Rehabilitation Act

A claim for retaliation is analyzed under the same three-part *McDonnell Douglas* burden shifting test, but the elements of the *prima facie* case for retaliation differ slightly from those for discrimination. To establish a *prima facie* case of retaliation, a plaintiff must demonstrate that: "(i) [he] was engaged in protected activity; (ii) the alleged retaliator knew that plaintiff was involved in protected activity; (iii) an adverse decision or course of action was taken against plaintiff; and (iv) a causal connection exists between the protected activity and the adverse action." *Natofsky*, 921 F.3d at 353 (citation omitted). "A causal connection in retaliation claims can be shown either (1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." *Id*. (citation and internal quotation marks omitted). However shown, the connection must be such that "discrimination was the but-for cause of any adverse employment action." *Id*. at 348.

If a *prima facie* case is established, a presumption of retaliation arises. "The defendant must then articulate a non-retaliatory reason for the adverse employment action." *Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010) (internal quotation marks and citation omitted). If such

---

[13] Although, as the Court in *Kleyman* explained, "*Natofsky* frames this requirement as applying generally to failure-to-accommodate claims . . . the failure to accommodate claim in *Natofsky* was based on an adverse employment action—the plaintiff's demotion." *Kleyman*, 2020 WL 5645218, at *12 n. 23. Thus, the Court reads *Natofsky* as applying this requirement to adverse employment actions claims involving a failure to accommodate as opposed to freestanding failure-to-accommodate claims. *See id*.

a reason is articulated, "the presumption of retaliation dissipates," *id*., and the employee "must show that retaliation was a 'but-for' cause of the adverse action, and not simply a 'substantial' or 'motivating' factor in the employer's decision." *Zann Kwan v. Andalex Group LLC*, 737 F.3d 834, 845 (2d Cir. 2013) (citing *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013)). "However, 'but-for' causation does not require proof that retaliation was the only cause of the employer's action, but only that the adverse action would not have occurred in the absence of the retaliatory motive." *Id*. at 846. "It is not enough that retaliation was a 'substantial' or 'motivating' factor in the employer's decision." *Vega v. Hempstead Union Free Sch. Dist*., 801 F.3d 72, 90-91 (2d Cir. 2015) (citation omitted).

## DISCUSSION

A single paragraph of Plaintiff's Amended Complaint contains the substantive claims he asserts against Defendants under the Rehabilitation Act: "The Defendants violated the Rehabilitation Act, 29 U.S.C. Section 504, et seq. by Defendants discriminating against Plaintiff on the basis of his disability and perceived disability and by failing to reasonably accommodate and retaliating against Plaintiff for requesting an accommodation as set forth above, which in turn caused his termination." (Am. Compl., ECF No. 26, ¶ 132.) The parties construe the Amended Complaint to assert two types of disability discrimination claims, *i.e*., a failure-to-accommodate claim and a termination claim, as well as a retaliation claim. (*See* Defs.' Mem. at 13-24; Pl.'s Opp. at 11-25.) The Court addresses these claims below.

**I.**    **Plaintiff's Discrimination Claims**

    **A.**    **Failure-To-Accommodate Claim**

Defendants do not dispute the first two elements of Plaintiff's failure-to-accommodate claim—*i.e.*, that Plaintiff is a person with a disability under the meaning of the Rehabilitation Act and that the Commerce Department had notice of Plaintiff's disability. *See Noll*, 787 F.3d at 94. In seeking summary dismissal of the failure-to-accommodate claim, Defendants make two arguments. First, they argue that Plaintiff could not perform the essential functions of his job with or without a reasonable accommodation. (*See* Defs.' Mem. at 13-15.) Second, they argue that the Commerce Department granted Plaintiff's accommodation requests. (*See id*. at 15-19.)

For the reasons set forth below, the Court finds that summary judgment should be denied with respect to Plaintiff's reasonable accommodation claim because there are genuine issues of material fact regarding whether or not Plaintiff could perform the essential functions of his job with a reasonable accommodation and whether Plaintiff's accommodation requests were granted.

    **1.**    **Whether Plaintiff Could Perform Essential Functions Of His Job**

Defendants argue that the undisputed evidence shows that Plaintiff was unable to complete major duties of Census Geographers with or without a reasonable accommodation and thus that Plaintiff was not "otherwise qualified" for the position. (Defs.' Mem. at 13-14.) Plaintiff contends that he was qualified for the position or, at least, there are material disputes of fact regarding his qualifications. (Pl.'s Opp. at 11-14.)

"A plaintiff cannot be considered 'otherwise qualified' unless [he] is able, with or without assistance, to perform the essential functions of the job in question." *Borkowski v. Valley Cent.*

*Sch. Dist.*, 63 F.3d 131, 137-38 (2d Cir. 1995). "Essential Functions" generally are defined "to mean fundamental duties to be performed in the position in question, but not functions that are merely marginal." *Stone v. City of Mount Vernon*, 118 F.3d 92, 97 (2d Cir. 1997) (internal quotation marks omitted).

It is undisputed that the primary duties of Geographers like Plaintiff included developing maps and analytical products, and providing customer support to state and local governments who were participating in programs to improve census address and boundary data, and that Geographers' duties included conducting research, analyzing census data, and updating maps, creating tracking spreadsheets, engaging in outreach to potential PSAP program participants and conducting phone interviews for LUCA. (Defs.' 56.1 ¶ 8; Pl.'s 56.1 ¶ 8.) It also is undisputed that telephone calls were a big part of the LUCA program (Defs.' 56.1 ¶ 95; Pl.'s 56.1 ¶ 95), and Plaintiff testified that his duties included answering incoming calls regarding the LUCA program. (Pl. Tr. at 60:7-10.) Thus, the foregoing duties were an essential function of Plaintiff's job. *See McMillan*, 711 F.3d at 126 (to determine what job junctions are essential, court must conduct 'a fact-specific inquiry into both the employer's description of a job and how the job is actually performed in practice.'" (quoting *Borkowski*, 63 F.3d at 140)).

"After the essential functions of the position are determined, the plaintiff must demonstrate that he or she could have performed these functions, with or without reasonable accommodation . . .." *McMillan*, 711 F.3d at 127 (citing *Borkowski*, 63 F.3d at 137-38)). As set forth above, Plaintiff "bears the burden of proving either that [he] can meet the requirements of the job without assistance, or that an accommodation exists that permits [him] to perform the job's essential functions." *Borkowski*, 63 F.3d at 138; *see also McBride*, 583 F.3d at 97. "The

burden of persuasion on the 'existence' of an 'effective accommodation' is not satisfied by mere speculation." *Jackan v. New York State Dep't of Lab.*, 205 F.3d 562, 566 (2d Cir. 2000). "By contrast, with regard to the reasonableness of a proposed accommodation, a plaintiff bears only a light burden of production that is satisfied if the costs of the accommodation do not on their face obviously exceed the benefits." *McBride*, 583 F.3d at 97 n.3. "The burden of persuasion falls on the defendant employer." *Id*.

In the present case, the Court finds that Plaintiff met his burden to identify an accommodation and that there are issues of fact as to whether the accommodation would have been effective. On July 17, 2018, Plaintiff expressly suggested the existence of a plausible accommodation—*i.e.*, "coaching/instruction and mentorship" (Berger 7/17/18 Email, Ex. L to Stein Decl., at PDF p. 2), which he contends was not provided to him. Defendants argue that Plaintiff received "significant guidance from his supervisors, including numerous one-on-one counseling and on the job trainings," but that Plaintiff still could not perform. (*See* Defs.' Mem. at 4-15.) By contrast, Plaintiff gave testimony that he received no formal training from Ritter and that he never had any one-on-one trainings. (Berger Tr. at 92:6-92:14; 180:2-4.) Moreover, Plaintiff stated in his sworn Declaration that neither Ritter nor Gillham provided the level of instruction or training needed for an individual with Asperger's Syndrome, but only provided "boilerplate instructions" that were given to all employees and generalized training.[14] (*See* Berger

---

[14] Defendants state in their moving memorandum that Plaintiff "struggled to respond to phone inquiries, which were unpredictable and with which he was not comfortable." (Defs.' Mem. at 14 (internal quotation marks and citation omitted).) However, Plaintiff has submitted a sworn Declaration stating that, after Ritter learned of Plaintiff's disability, she instructed him to answer LUCA calls and take a message only when the rest of the team was busy. (*See* Berger Decl. ¶ 57; *see also id*. ¶ 88.) Thus, there is an issue of fact as to whether, with proper coaching/instruction and mentorship, Plaintiff effectively could handle telephone inquiries.

Decl. ¶¶ 81-84.) Thus, there are issues of fact regarding whether, with his requested accommodation (*i.e.*, proper coaching/instruction and mentorship[15]), Plaintiff would have been able to perform the essential functions of his job.

### 2.    Whether Plaintiff's Accommodation Requests Were Granted

Defendants next argue that Plaintiff did not request any accommodations other than the ones that were provided to him (*i.e.*, a desk relocation and a flexible work schedule).[16] (*See* Defs.' Mem. at 16-17.) However, the Court finds that there are issues of fact regarding what additional accommodations Plaintiff requested.

On May 30, 2018, Plaintiff made his first request for reasonable accommodations, which asked for a desk relocation and a flexible work schedule.[17] (Ex. K to Stein Decl., ECF No. 64-11.). In July 2018, after some delay, Plaintiff finally was provided with a copy of his May 15 written performance review. (Berger Decl. ¶ 98.) On July 16, 2018, Plaintiff sent an email to Watson in the Reasonable Accommodations Bureau, stating that he had received his review, and that "[t]here [were] some areas that [he had] concern about and [felt] an accommodation would better help [him] get up to where [he] need[s] to be." (Berger 7/16/18 Email, Ex. L to Stein Decl.,

---

[15] Defendants have not made a showing on their pending motion that the costs of Plaintiff's requested accommodation exceeded its benefits.

[16] In his opposition memorandum, Plaintiff notes that there was a 45-day delay in him being provided these accommodations. (*See* Pl.'s Opp. at 18.) A delay in providing a reasonable accommodation can be actionable "if that delay is caused by discriminatory animus and is sufficiently lengthy to constitute a constructive denial of a reasonable accommodation." *Franks v. Eckert*, No. 18-CV-00589 (EAW), 2020 WL 4194137, at *4 (W.D.N.Y. July 21, 2020). There is no record evidence here of a discriminatory animus with respect to this delay and, in any event, a 45-day delay does not seem to be sufficiently lengthy. *See Logan v. Matveevskii*, 57 F. Supp. 3d 234, 271 (S.D.N.Y. 2014) ("[C]ourts have found plaintiffs' requests for reasonable accommodations to have been constructively denied after delays approximating four months." (collecting cases)).

[17] Defendants note that these were the only accommodations contained in the May 31, 2018 request. (*See* Defs.' Mem. at 16.)

at PDF p. 4.) Then, after receiving a response from Watson, saying that "a reasonable accommodation cannot lower performance standards" (Watson 7/17/18 Email #1, Ex. L to Stein Decl., at PDF p. 3), on July 17, 2018, Plaintiff sent an email to Watson in which he indicated that he thought the performance standards could be met but that "there do need to be some modifications in terms of coaching/instruction and mentorship." (Berger 7/17/18 Email, Ex. L to Stein Decl., at PDF p. 2) Later, in a telephone call on July 17, 2018, that followed, Plaintiff asserts that Watson informed him that the Census Bureau did not have the resources to provide a job coach and told him that his requested accommodation was too burdensome. (Berger Decl. ¶ 104.)

Defendants point to a statement by Watson in her July 17, 2018 email in which she "highly encourage[d] [Plaintiff] to engage in the interactive process with [his] Supervisor" (*see* Defs.' Mem. at 4-5 (quoting Ex. L to Stein Decl. at USA_0262)), and argue that "Plaintiff never engaged in the interactive process with his supervisor, as Ms. Watson suggested." (*Id*. at 5.) The required "interactive process" under the Rehabilitation Act (like the ADA) is one where "employers and employees work together to assess whether an employee's disability can be reasonably accommodated." *McBride*, 583 F.3d at 99. The "interactive process" is initiated by an employee's request for a reasonable accommodation, *see Tafolla v. Heilig*, 80 F.4th 111, 122 (2d Cir. 2023), and it is undisputed that Plaintiff made requests for reasonable accommodations. After Plaintiff received Watson's July 17, 2018 email stating that he should "engage in the interactive process with [his] [s]upervisor" (Ex. L to Stein Decl. at USA_0262), Plaintiff responded to Watson noting that there was no "full time regular supervisor," that "since March [2018] we have had interim supervisors for 3 month terms who have never been supervisors before" and that "[t]he person

in charge of all of us works remotely out of state." (Berger 7/17/18 Email at PDF p. 2.) There is no evidence that Plaintiff's supervisors reached out to him to engage in an interactive process. Thus, to the extent that Defendants are arguing that Plaintiff somehow was responsible for a breakdown in the interactive process, viewing the evidence in the light most favorable to Plaintiff, Defendants would not be entitled to summary judgment on Plaintiff's failure-to-accommodate claim. *See Tafolla*, 80 F.4th at 123-25 (reversing summary judgment because of "fact-intensive question" as to who was responsible for breakdown in interactive process).

In sum, there are issues of fact regarding whether Plaintiff made requests for reasonable accommodations other than those which Defendants acknowledge receiving, and regarding the required interactive process. Accordingly, it is recommended that Defendants' motion for summary judgment seeking dismissal of Plaintiff's Rehabilitation Act failure-to-accommodate claim be denied.

### B.     Termination Claim

Defendants do not dispute the first two elements of Plaintiff's *prima facie* case in support of his termination claim under the Rehabilitation Act—*i.e.*, that his employer is subject to the Rehabilitation Act and that Plaintiff is a disabled person as defined by the Rehabilitation Act. *See Edwards*, 2020 WL 2792997, at *9. Rather, in seeking dismissal of Plaintiff's termination claim, Defendants argue that Plaintiff has not established a *prima facie* case of disability discrimination because he allegedly failed to come forward with evidence establishing that he was otherwise qualified to perform the essential functions of his job and because there allegedly is no evidence that demonstrates that Plaintiff was terminated because of his disability. (Defs.' Mem. at 22-23.)

The Court finds that Defendants are not entitled to summary judgment. As set forth in Discussion Section I.A, *supra*, there are factual issues regarding whether, with coaching/instruction and mentorship, Plaintiff would have been able to perform the essential functions of his job. Consequently, there also are factual issues regarding whether Plaintiff's termination was due to his disability. "Where, as here, a plaintiff is alleging disability-based discrimination, an inference of discrimination can . . . be drawn from an employer's failure to provide reasonable accommodations." *Nakis v. Potter*, 422 F. Supp. 2d 398, 422 (S.D.N.Y. 2006) (citing *Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 332 (2d Cir. 2000)). In addition, invidious comments that "refer directly or indirectly to [a] plaintiff's protected class" can satisfy the burden of linking an adverse employment action to discrimination. *Id.* As previously noted, Gillham was the person who terminated Plaintiff in August 2018, and she had made hostile remarks to him about his disability in a meeting six weeks earlier (*see* Berger Decl. ¶¶ 86-94; *see also* Pl.'s Opp. at 22-23.) Moreover, given the issues of fact with respect to whether Defendants provided Plaintiff with reasonable accommodations, and construing the record in the light most favorable to Plaintiff, a reasonable jury could conclude that there is evidence of discriminatory animus.

In support of dismissal, Defendants also argue that Plaintiff's poor performance provided a legitimate, nondiscriminatory reason for Defendants to terminate Plaintiff. (Defs.' Mem. at 23-24.) However, on the record before the Court, viewing the evidence in the light most favorable to Plaintiff, a reasonable jury could conclude that the reason for Plaintiff's poor performance was Defendants' failure to provide reasonable accommodations. Thus, in the circumstances presented, Plaintiff's performance does not provide a legitimate nondiscriminatory reason for termination. *See* EEOC, *A Technical Assistance Manual on the Employment Provisions (Title I) of*

*the Americans with Disabilities Act*, at VII (7.7) (1992), available at https://perma.cc/5QDR-BXGV ("An employer may not discipline or terminate an employee with a disability if the employer has refused to provide a requested reasonable accommodation that did not constitute an undue hardship, and the reason for unsatisfactory performance was the lack of accommodation.").

Even if Plaintiff's performance could be construed as a legitimate, non-discriminatory reason for his termination, Plaintiff has offered evidence from which a jury could conclude that this reason was pretextual. *See Balchan*, 2025 WL 588021, at *5. One of the two critical elements referred to in Plaintiff's August 2024 termination letter that Plaintiff failed to perform, according to Gillham, was his failure to answer LUCA "support calls as required." (Gillham 8/24/18 Ltr. at 1.) However, by August 2024, the call-answering portion of the LUCA project had been completed for over a month. (Berger Decl. ¶ 109.) This is some evidence that Plaintiff's failure to perform in respect of LUCA calls was pretextual.

Accordingly, it is recommended that Defendants' motion for summary judgment seeking dismissal of Plaintiff's Rehabilitation Act termination claim be denied.

## II.    <u>Retaliation Claim</u>

Defendants argue that "Plaintiff has failed to adduce any evidence establishing a causal connection between his accommodation requests and his termination" and that "[t]he record is devoid of any direct evidence of retaliatory animus against Plaintiff." (Defs.' Mem. at 20.) However, "[t]he causal connection needed for proof of a retaliation claim can be established indirectly by showing that the protected activity was closely followed in time by the adverse action." *Nadel v. Shinseki*, 57 F. Supp. 3d 288, 298 (S.D.N.Y. 2014) (quoting *Cifra v. Gen. Elec. Co.*, 252 F.3d 205, 217 (2d Cir. 2001) (internal quotation marks omitted)). Moreover, "[p]rotected

activities include requests for reasonable accommodations." *Wells v. Achievement Network*, No. 18-CV-06588 (KPF), 2021 WL 810220, at *11 (S.D.N.Y. Mar. 2, 2021) (citing *Weixel v. Bd. of Educ. of City of N.Y.*, 287 F.3d 138, 148 (2d Cir. 2002)).

In the present case, Plaintiff presents evidence that he requested accommodations as late as July 17, 2018, and he was terminated on August 26, 2018. This temporal proximity is close enough to raise the necessary inference of retaliatory intent. *See Dodd v. City Univ. of N.Y.*, 489 F. Supp. 3d 219, 247 (S.D.N.Y. 2020) ("Generally, to show causation through temporal proximity alone, courts in this Circuit require no more than two months to have passed between a protected activity and an adverse action.").[18]

Accordingly, it is recommended that Defendants' motion for summary judgment seeking dismissal of Plaintiff's Rehabilitation Act retaliation claim be denied.[19]

## CONCLUSION

Viewing the record evidence in the light most favorable to Plaintiff, there are genuine issues of material fact that preclude summary dismissal of Plaintiff's Rehabilitation Act claims. For the foregoing reasons, it is respectfully recommended that Defendants' motion for summary judgment be GRANTED IN PART and DENIED IN PART. Specifically, it is recommended that

---

[18] Plaintiff also has put forth evidence to show that, after he made his initial request for reasonable accommodations in May 2018, he was treated less well. (*See* Berger Decl. ¶¶ 75, 78.)

[19] Defendants also argue that, even if Plaintiff could establish a *prima facie* case of retaliation, his retaliation claim would fail because the Commerce Department had a legitimate nondiscriminatory reason for firing him—that Plaintiff lacked the requisite skills to perform his job. (Defs.' Mem. at 21.) However, as set forth in Discussion Section I.A.1., *supra*, there is a factual issue regarding whether, with coaching/instruction and mentorship, Plaintiff would have been able to perform the essential functions of his job. In addition, as set forth in Discussion Section I. B., *supra*, there is a factual issue regarding whether the performance-based reasons for Plaintiff's termination were pretextual.

summary judgment be granted to Defendants dismissing Plaintiff's claims under the ADA (*see* footnote 12, *supra*), but that the motion otherwise be denied.

Dated:    March 27, 2025
          New York, New York

STEWART D. AARON
United States Magistrate Judge

*          *          *

**NOTICE OF PROCEDURE FOR FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION**

The parties shall have fourteen (14) days (including weekends and holidays) from service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure. *See also* Fed. R. Civ. P. 6(a), (d) (adding three additional days when service is made under Fed. R. Civ. P. 5(b)(2)(C), (D) or (F)). A party may respond to another party's objections within fourteen days after being served with a copy. Fed. R. Civ. P. 72(b)(2). Such objections, and any response to objections, shall be filed with the Clerk of the Court. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b). Any requests for an extension of time for filing objections must be addressed to Judge Woods.

**FAILURE TO OBJECT WITHIN FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW.** *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b); *Thomas v. Arn,* 474 U.S. 140 (1985).